UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

D.L,

      Plaintiff,

v.

      Defendant.

KALAMAZOO PUBLIC SCHOOLS,

Hon.
Mag.
Case No.

**COMPLAINT / JURY DEMAND-
504/ADA**

***Related Case Notice***

This case presents the same plaintiff, underlying facts and issues as that in *D.L; K.S.F.; and K.B., by and through her parent and next friend H.B., v. Michigan Dep't of Education*, Case No. 2:19-cv- 22-cv-00838, before Hon. Robert J. Jonker.

| | |
|---|---|
| Mitchell D. Sickon (P82407)<br>Erin H. Diaz (80388)<br>**Disability Rights Michigan**<br>4095 Legacy Parkway<br>Lansing, Michigan 48911<br>517-487-1755<br>MSickon@drmich.org<br>Ediaz@drmich.org<br><br>Elizabeth Abdnour (P78203)<br>**Elizabeth Abdnour Law, PLLC**<br>1100 W. Saginaw Street, Ste. 4A-2<br>Lansing, Michigan 48915<br>517-292-007 | |

| | | |
|---|---|---|
| elizabeth@abdnour.com<br><br>Jacquelyn N. Babinski (P83575)<br>**MI AECRES**<br>PO Box 705<br>Ludington, Mic<br>jbabinski@miaecres.org | | |

# COMPLAINT

## I. INTRODUCTION

> Illiteracy is an enduring disability. The inability to read and write will handicap the individual deprived of a basic education each and every day of his life. The inestimable toll of that deprivation on the social, economic, intellectual, and psychological well-being of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost or the principle of a status-based denial of basic education with the framework of equality embodied in the Equal Protection Clause.

*Plyler v. Doe*, 457 U.S. 202, 222 (1982).

1.     This is a special education case involving illiteracy. For years, Kalamazoo Public Schools (District) failed to evaluate D.L., misunderstood the nature of his disability, and thus failed to support him *appropriately*. Instead of reading at a level commensurate with his abilities, D.L. graduated high school at a third-grade reading level.

2.     D.L.'s high school transcript shows 13 failed classes ("Fs") and 15 "passed" classes (all "Ds")—the "watered down" expectations expressly rejected in *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000-01 (2017) (holding that IDEA requires a "markedly more demanding standard" of progress). Tragically, the school district recycled—literally cut and pasted—the same educational goals, with the same ineffective results, year after year after year. So, year after year, D.L. attended school without the functional ability to read or do basic math.

3.     Had the District complied with its legal obligations and undertaken the proper educational evaluations and re-evaluations, required by the Individuals with Disabilities Education Act (IDEA) for students like D.L., and then provided him with the appropriate reading and social-emotional supports, including assistive technology, D.L. could have learned to read at an eighth-grade level.  For him, that would have been *meaningful progress*—a free *appropriate* public education (FAPE). Instead, by the time of his "graduation," at 18 years old, D.L. could barely divide or multiply, and he was reading at a *third-grade* level—far beneath what his actual abilities allow.

4.     D.L. now seeks compensatory education, including weekly therapeutic interventions, with an intensive focus on reading and math instruction.  D.L. additionally seeks economic damages for the loss of income due to the District's

denial of a FAPE and discrimination under Section 504 of the Rehabilitation Act of

1973 (Section 504), 29 U.S.C. § 794, and Title II of the Americans with Disabilities

Act (ADA), 42 U.S.C. §§ 12131 *et seq*. This will afford him the ability to function

fully in society and to have a productive career in the construction industry, as D.L.

desires.

## II. PARTIES, JURISDICTION AND VENUE

5.    The Plaintiff is D.L., a student eligible under the IDEA with a specific

learning disability. D.L. is also an individual with a "disability" within the meaning

of Section 504 and the ADA, as multiple impairments[1] substantially limit him in life

activities including reading, learning, communicating and interacting with others. 28

C.F.R. § 35.108; 34 C.F.R. § 34.104.3.

6.    Defendant Kalamazoo Public Schools (District) is a local education

agency (LEA) subject to the provisions of the IDEA. It was responsible for providing

D.L. a FAPE under the IDEA. 20 U.S.C. §§ 1400-1419.  The District is a recipient

of federal financial assistance, subject to the requirements of Section 504, 34 C.F.R.

---

[1]  D.L.'s impairments include severe specific reading disorder, a severe mathematics disorder, attention deficit hyperactivity disorder (ADHD) combined-type, post-traumatic stress disorder (PTSD), complicated grief, major depressive disorder in remission, panic disorder in remission, and rule-out diagnoses of disruptive mood dysregulation disorder, mild neurocognitive/post concussive effects affecting cognitive and fine motor functioning, and central auditory processing disorder.

§ 104.31 *et seq.*, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. §§ 12132, 12131(1)(A), (B).

7.     D.L. brings this civil action against the District, having exhausted administrative prerequisites by filing a due process complaint against the Defendant under (IDEA), 20 U.S.C. § 1400 *et seq.*[2]

8.     Jurisdiction is conferred upon this Court by 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide the district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, based upon the federal question raised herein, and under 28 U.S.C. § 1343, because this action is brought to vindicate Plaintiffs' civil rights under the IDEA, Title II of the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act of 1973 (Section 504). Additionally, this Court has the authority to award any relief it deems appropriate, including injunctive relief under Fed. R. Civ. P. 65(a). 20 U.S.C. §1415(i)(2)(C)(iii). There is a present and actual controversy

---

[2]  On October 21, 2021, Plaintiff filed a Complaint and Request for a Special Education Due Process Hearing against the District, Kalamazoo Regional Educational Service Agency (RESA), Michigan Department of Education, and Superintendent Rice in his official capacity, pursuant to: the IDEA, 20 U.S.C. §§ 1400 *et seq.*; the Michigan Administrative Rules for Special Education, Michigan Admin. Code R 340.1701 *et seq.*; the Michigan Special Education Act, MCL 380.1701 *et seq.*; Section 504, 29 U.S.C. § 794; and the ADA, 42 U.S.C. §§ 12131 *et seq.*; and the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.* On December 20, 2021, the Administrative Law Judge dismissed all parties other than the District and all claims other than those arising under the IDEA.

between the parties to this action. To the extent required by law, Plaintiffs have exhausted their administrative remedies as to the issues in this action.

9.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiff resides within the Western District of Michigan, and all events and omissions giving rise to this Complaint occurred in this district.

## III.   FACTS

10.    Plaintiff, D.L., has long had a specific learning disability (SLD), a qualifying condition under the IDEA.

11.    In school, D.L. was described as polite, socially engaged, and having a desire to succeed. However, these *outwardly* favorable traits masked his inward disability.

12.    D.L.'s brain does not hold onto sounds while he is reading words, a problem with his working memory. Instead of reading text, he scans lines for words he might recognize and then puts the sentence in his own words. And for information that D.L. can store, he has great difficulty *communicating that knowledge to others*. Similar to a stroke victim, D.L. "[has] information but [he] can't communicate it." Due Process Hr'g Tr. at 59, *D.L. v. Kalamazoo Pub. Schs.*, No. 21-027515 (Jan. 10, 2022).

13.    Tragically, from 2012 to 2021, the District failed to perform the evaluations necessary to fully comprehend the nature of D.L's specific learning

disability. While it recognized his *eligibility* for special education services as a student with SLD, the lack of evaluations resulted in a foreseeable failure to deliver the appropriate *individualized* supports in school.

14.     As an example, as far back as 2012, the District had evidence of D.L.'s "high likelihood of attentional weaknesses in the academic setting," but failed to evaluate how D.L.'s executive functioning—his abilities to control impulses, focus, and follow through on tasks—might affect his performance.

15.     As a result, throughout his time at the District, D.L. had a hard time staying tuned in to classroom lectures and following directions, and these symptoms of his ADHD *compounded* the difficulties that he faced with his working memory in reading. Without appropriate evaluations, the District could not track how D.L.'s different disability-related conditions *interacted with each other* to create a unique learning profile.

16.     By 2017, D.L.'s 9th grade year, the District no longer even performed perfunctory standardized assessments to understand D.L.'s performance in reading. And by 2018, it stopped performing them for math as well. The District stopped performing these assessments despite data showing that D.L. was falling further and further behind in both subjects when compared to his peers.

17.    By 2021, when D.L. "graduated," his high school transcript showed 13 failed classes ("Fs") and 15 "passed" classes (all "Ds"). And even *those* were compromised, as D.L. relied on classmates simply to get by.

18.    At the due process hearing, expert forensic examination of D.L.'s IEPs—the goals, the supports, etc.—revealed that the District had cut and pasted year after year after year.  As one of D.L.'s expert witnesses explained: "[T]hings were copied and pasted at the beginning and copied and pasted at the end…it's not like things changed from 2012 to 2020." Due Process Hr'g Tr. at 152, *D.L. v. Kalamazoo Pub. Schs*, No. 21-027515 (Jan.10, 2022).

19.    To the District, D.L.'s in-class data (grades, teacher reports, etc.) was reliable enough to justify all its cutting and pasting and repeating in his IEPs. But as the District continually failed to conduct full and appropriate *evaluations*, the District had the wrong picture of D.L. entirely. The wrong inputs produced the wrong outputs.

20.    Testimony from a certified expert in pediatric neuropsychology stated that if the District had but performed basic psychoeducational evaluations, it would have uncovered data sufficient to understand D.L.'s unique learning profile. *See* Due Process Hr'g Tr. at 46, *D.L. v. Kalamazoo Public Schools*, No. 21-027515 (Jan.10, 2022). By failing to perform the psychoeducational evaluations and by dodging the required re-evaluations for nine years, it was impossible for the District to

understand D.L.'s true needs and deliver appropriate supports for a FAPE. Instead of accepting responsibility, the District concluded that the problem was *with the student, not itself,* assuming he didn't want their support when D.L. was responding to their inappropriate supports consistent with the disabilities the District had failed to understand.

21.     In June 2021, the District issued D.L. a high school diploma. Yet its own data demonstrated he was reading at a third-grade level, stagnant for years, when his *abilities* should have allowed him to reach at least an eighth-grade level.

22.     By failing to conduct comprehensive initial evaluations (as a baseline), the District long misunderstood D.L.'s abilities and the supports he needed. Later, by failing to perform the IDEA's "triannual evaluations" (every three years), the District maintained its own misunderstanding. In fact, even the District admitted that *for nine years* it believed "no additional testing was required in order to redetermine [D.L.'s] eligibility for special education and related services."[3]

23.     In August of 2021, after his high school "graduation," D.L. was evaluated by an *independent* expert. At that time, he learned for the first time about the true nature and severity of his disabilities, the potential he had in reading and

---

[3] District's Mot. to Dismiss at 2, *D.L. v. Kalamazoo Public Schools*, No. 21-027515 (Nov. 1, 2021).

9

math, and the role appropriate reading interventions and assistive technology might serve in helping him achieve his potential.

24.     Appropriate evaluations, and the subsequent provision of appropriate reading supports and assistive technology, would have allowed D.L. to *express* his knowledge ("to share what he knows") rather than assuming he was deliberately shutting down. This, in turn, would have resulted in appropriately graduated IEPs—*appropriate* present levels, goals, and the supports to make meaningful progress in light of his circumstances—rather than blaming D.L. for his own lack of progress.

25.     Within two months of discovering the District's failures, on October 22, 2021, D.L. filed for due process for the denial of FAPE. *See* n. 2, *supra.*

26.     At the outset, the ALJ refused to consider a complete picture of D.L.'s circumstances by ruling that his remedy was artificially confined to a two-year period of time stretching from October 22, 2021 back to October 22, 2019—two years prior to the date the Due Process Complaint was filed.  This ruling was clear error as it ignored the "discovery rule" under the IDEA and the fact that it affords D.L. a remedy for the *entire deprivation* of FAPE, not just for the two-year period prior to the filing deadline.

27.     After a four-day hearing, including eight witnesses, the ALJ waited five months after final briefing to issue a decision.  Having inappropriately limited the claims, the ALJ, like the District, then largely *blamed D.L.* for not learning, despite

the lack of evaluations, the revolving door of IEPs, and the misunderstanding of

D.L.'s support-needs. Accordingly, he appeals.

## V. IDEA CLAIMS

### A. *Misunderstanding the Scope of FAPE Denial*

28.    First, the ALJ deprived D.L. of an appropriate review of his case by

misunderstanding the IDEA's statute of limitations and the application of the

*discovery* rule. 20 U.S.C. § 1415(f)(3)(C).[4] The ALJ apparently believed that

misrepresentations or withholding of information by the District had to occur in

---

[4] IDEA's 2004 Amendments established the discovery rule: a "parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency *knew or should have known* about the alleged action that forms the basis of the complaint" unless the state establishes another timeline. 20 U.S.C. § 1415(f)(3)(C) (emphasis added). Thus, parties have two years from discovery of their claim to timely *file* a due process complaint. The remedy, however, can extend for the entire period of the deprivation and is not limited to the two years of discovery. *See G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 619, 620-21 (3d Cir. 2015) (holding that if a due process complaint is "timely filed, then, upon a finding of liability, the entire period of the violation should be remedied" because the court understood "that 'a child's entitlement to special education should not depend upon the vigilance of parents (who may not be sufficiently sophisticated to comprehend the problem).'" (*citing M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 396-97 (3d Cir. 1996)); *Ruhl v Ohio Dep't of Health*, No. 1:16-CV-773, 2017 WL 1355697, at *6 (N.D. Ohio Apr 13, 2017), aff'd sub nom *Ruhl v Ohio Health Dep't*, 725 F App'x 324 (6th Cir. 2018) (citing approvingly to *Ligonier*, but ultimately finding that the Petitioner failed to timely file her complaint within two years of discovery); *A.R. v. Sturgis Pub. Schs.*, *Order Regarding Respondents Motions to Dismiss*, Dkt No. 18-000201; Case No.: 18-00004, 7 (Mar 6, 2018) (". . . IDEA's two-year statute of limitations period does not prohibit Petitioner from seeking relief for alleged denials of FAPE that occurred more than two years earlier, since he filed his complaint within two years of discovering the alleged violation."); *see also*, *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 944 (9th Cir. 2017) (finding that a complaint is timely if filed two years from the date that parents knew or should have known); *Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 114 (2d Cir. 2008) (parent knew or should have known of FAPE violation once student made rapid improvement and educational expert determined she was denied a FAPE); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1288 (11th Cir. 2008) (holding that the "knew or should have known" date occurred after the district's reevaluation and declining to find that the "family should be blamed for not being experts about learning disabilities.").

order for evidence beyond the two-year statute of limitations to be considered. That is incorrect.

29.     Students with disabilities are not disability experts or experts on the educational needs that are a result of their disabilities. Instead, they are reliant upon the *school district* to perform timely evaluations, including triannual reevaluations. When these do not occur, and when a student only learns much later—here in 2021—of a district's failures to properly evaluate and support his disabilities, the discovery rule affords a complete remedy. Courts have routinely ordered awards to remedy IDEA violations that occurred more than two years prior to the date of filing. *See Draper*, 518 F.3d at 1288 (rejecting school's argument that the student's parents ought to have known the school had misdiagnosed the student before the school's professionals knew and affirming compensation for all the years of deprivation); *Ligonier*, 802 F.3d at 620 (collecting cases).

**B. *Failures to Evaluate Resulted in Inadequate IEPs (a Denial of FAPE)***

30.     Second, the Defendant failed in its ongoing duty to conduct comprehensive educational evaluations leading to inadequate IEPs, a denial of FAPE.

31.     Defendant's responsibility for initial evaluations and reevaluations includes determining "*the educational needs* of the child." 34 C.F.R. 300.305(a)(2)(i) (emphasis added). Put another way, both types of evaluations seek

to understand (1) how a student's disability-related needs show up in the classroom as potential obstacles to progress and (2) what one could expect in terms of the student's *performance* based on the student's *abilities*.

32.     Initial evaluations set a baseline, and re-evaluations allow for ongoing monitoring of progress. Should a set of IEP supports fail to produce appropriate progress, reevaluations can provide justification for adjusting course—i.e., a "*cogent and responsive explanation* for [school authorities'] decisions that shows the IEP is *reasonably calculated* to enable the child to make progress appropriate in light of his circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1002 (2017) (emphasis added). For D.L., compounding failures yielded inadequate IEPs, largely cut-and-pasted through the years, and a multi-year denial of FAPE.

33.     Had Defendant performed comprehensive *initial* evaluations in 2012, the Defendant would have determined the true nature of D.L.'s unique learning profile—the working memory difficulties, the large gap between his verbal and nonverbal intellectual functioning, and the executive functioning weaknesses. This, in turn, would have required Defendant to afford D.L. an "educational program reasonably calculated to enable [D.L.] to make progress appropriate in light of [his] circumstances," one that afforded him appropriate reading and other supports, along with assistive technology, tailored to his individual learning style. *Id.* In short, it

would have enabled D.L. to learn to read and compute in accordance with his circumstances.

34.    Instead, for the following nine years, Defendant not only failed to provide appropriate services tailored to D.L.'s disabilities, it never conducted *re-evaluations* either even though D.L. failed to make progress and fell further and further behind his peers. In fact, Defendant never used any standardized means of simply *assessing* D.L.'s *performance* in reading after 2017, or his *performance* in math after 2018. In-class assignments are no substitute for appropriate evaluations or for appropriate standardized assessments, which seek to determine performance within a norm-referenced context of a student's national peers, not just his classmates. Throughout, D.L. was denied the appropriate supports and assistive technology for his learning profile because the District kept itself in the dark.

35.    Nor did Defendant conduct a *functional* evaluation for any behavioral issues. IDEA contemplates an appropriate education as having two primary domains—the academic (subject area mastery) and the functional (behavioral, social, and life skills). Behavior is a form of communication, and illiteracy would be an obvious source of frustration for any student.  And it certainly was for D.L.

36.    Ultimately, the ALJ acknowledged that D.L. was *not* making progress and that the same IEP *was* being repeated. But the ALJ substituted "classroom

performance and input from teachers," as if those *were evaluations*.[5]   While classroom performance data will demonstrate how a student is currently doing, evaluations provide more pointed information on a student's level of functioning, how a student learns, and what their achievement potential is. Clearly, they are not the same.

37.    In the end, the ALJ made the same mistake as the District: equating classroom performance and input from teachers with more robust measures of D.L.'s ability, needs, and performance—the special education evaluations required by law. While the teachers and the IEP Team understood D.L.'s *eligibility* for services based on a severe learning disability, that label, alone, did not address D.L.'s specific learning profile, how he learns—the appropriate reading and other supports, and assistive technology—that will allow him to make progress in light of his circumstances.  The recycled IEPs did not deliver FAPE for D.L., and the results prove it.

38.    It is the District that is charged with the obligation to "conduct a full and individual initial evaluation . . . before the initial provision of special education and related services" and to reevaluate Plaintiff every three years after, to determine

---

[5]  "How the Student is progressing compared to his same-grade peers is an appropriate measure of the Student's progress, and the Respondent appropriately incorporated these assessments into its evaluations of data for the Student."  Due Process Hr'g Decision and Order at 34, *D.L. v. Kalamazoo Pub. Schs.*, No. 21-027515 (Oct. 13, 2022).

his disability-related needs in the classroom, not just his continued eligibility. 34 C.F.R. §§ 300.301, 303. It failed to do so for *nine* years, denying D.L. a FAPE for the entire period.

### C. Blaming the Student with a Disability is No Defense

39.    Petitioners presented ample evidence at the due process hearing of D.L.'s humiliation, and his struggles to survive in reading and math. Yet, despite four days of testimony, the ALJ delivered only 23 Findings of Fact.

40.    Parroting a District theme, with no sensitivity to the extraordinary damage and humiliation of illiteracy, the ALJ said D.L. "cheated … to pass his class and graduate," and that D.L. "did not avail himself of the services that *were* offered" (emphasis added). Building on this blameworthy theme, the ALJ concluded D.L. "did not need additional services."

41.    Not only is the harm of illiteracy well established legally, and through the expert witnesses in this case, but D.L. himself took the stand.  He explained how he felt humiliated when, in response to ADHD-type behaviors, teachers asked him to read aloud and how other students would laugh at him. The ALJ's conclusion that D.L. "was simply not interested in earnestly attempting to do the assigned work" fundamentally misunderstands the IDEA. The IDEA requires that students with disabilities be supported as *individuals*, and schools that fail to gain a working

knowledge of such individual needs through standard evaluations, such as the District, ought not be rewarded.

42.     In sum, denying D.L. appropriate evaluations, improperly constructing IEPs with deficient supports, resulting in a shameful inability to read, is a *liability* of the District.  It was inappropriate for the ALJ to disregard the testimony of experts and base his decision on his own opinion that the Plaintiff (who was provided *inadequate* supports) will not use *adequate* ones or that his only means for survival ("cheating") precludes him from receiving appropriately constructed IEPs and a FAPE as the IDEA requires.

## VI. SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794, AND TITLE II OF THE ADA, 42 U.S.C. §§ 12131 et seq.

43.     Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

44.      Pursuant to Section 504 and its regulations, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

45.     The regulations regarding Preschool, Elementary, and Secondary Education apply to "preschool, elementary, secondary, and adult education programs

or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

46.     In general, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

47.     Defendant is a recipient of federal financial assistance and operates a public elementary or secondary education program or activity. Therefore, it is a covered entity under Section 504. 29 U.S.C. § 794.

48.     D.L. is a person with a disability within the meaning of Section 504. 29 U.S.C. § 794.

49.     Defendant failed to engage in evaluations and reevaluations as specified and required, thus violating Section 504. 34 C.F.R. § 104.35.

50.     Defendant has intentionally discriminated against D.L. in violation of Section 504 by failing to provide or ensure the provision of comprehensive educational evaluations resulting in a denial of a FAPE to D.L.

51.     Defendant had knowledge from 2012 that D.L. was exhibiting ADHD-type behaviors and had consistent data from past and present demonstrating that D.L. was not making progress. Therefore, the failure to conduct a psychoeducational

evaluation that contained a cognitive functioning component demonstrates deliberate indifference.

52.     Defendant has otherwise intentionally discriminated against D.L. in violation of Section 504.

53.     As a direct and proximate cause of Defendant's violation of Section 504, Plaintiff has suffered substantial harm to, among other things, his educational experience and opportunity, academic and intellectual progress, and future earning capacity.

54.     Similarly, Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35. Moreover, Title II requires existing services to be "*equally* accessible to people with communication disabilities." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1097 (9th Cir. 2013).

55.     Defendant is a public entity subject to Title II of the ADA, 42 U.S.C. § 12131.

56.     D.L. is a person with a disability within the meaning of the ADA. 42 U.S.C. § 12102.

57.     Defendant intentionally violated D.L.'s rights under the ADA and the

regulations promulgated hereunder by excluding him from participation in and denying him the benefits of Defendant's services, programs, and activities, and by subjecting him to discrimination in violation of 42 U.S.C. § 12132.

58.     By failing to conduct comprehensive evaluations, Defendants failed to provide necessary communication accommodations that would allow D.L. to equally access his school work, resulting in intentional discrimination against D.L., in violation of 42 U.S.C. § 12132.

59.     As a direct and proximate cause of the Defendant's violations of the ADA, Plaintiff has suffered substantial harm to, among other things, Plaintiff's educational experience and opportunity, academic and intellectual progress, and future earning capacity. 42 U.S.C. §§ 12132, 12182.

## VII. REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Issue a Declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the District violated the IDEA by knowingly failing to provide D.L. with a FAPE from 2015 to 2021;

B.     Vacate the October 13, 2022 Decision and Order of the ALJ;

C.     Award the monetary equivalent of 780 hours of compensatory education in a fund so D.L. may seek out appropriate educational providers and pay

them directly for as long as it takes for him to complete the remedial reading and mathematics curriculum;

D.     Award D.L. with the monetary equivalent of 104 hours of mental health treatments to support his ability to benefit from those hours of compensatory education;

E.     Award D.L. damages of $17,000 per year for the expected duration of his working career for lost income due to discrimination under Section 504 and the ADA;

F.     Order Defendant to pay Plaintiffs' reasonable attorneys' fees and costs for this action; and

G.     Order any other and further relief, both legal and equitable, that this Court may deem just and proper.

Respectfully submitted,

Attorneys for Plaintiff,

/s/ *Erin H. Diaz*
Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
Disability Rights Michigan
4095 Legacy Parkway
Lansing, Michigan 48911
517-487-1755
ediaz@drmich.org
msickon@drmich.org

Elizabeth K. Abdnour (P78203)
Elizabeth Abdnour Law, PLLC
1100 W. Saginaw Street, Ste. 4A-2
Lansing, Michigan 48915
517-292-0067
elizabeth@abdnour.com

Jacquelyn N. Babinski (P83575)
MI AECRES
PO Box 705
Ludington, Michigan 49431
231-794-2379
jbabinski@miaecres.org

Dated: December 20, 2022

## **<u>JURY DEMAND</u>**

Plaintiffs demand a jury trial in the above-captioned matter.

Respectfully submitted,

Attorneys for Plaintiff,


/s/ *Erin H. Diaz*
Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
Disability Rights Michigan
4095 Legacy Parkway
Lansing, Michigan 48911
517-487-1755
ediaz@drmich.org
msickon@drmich.org


Elizabeth K. Abdnour (P78203)
Elizabeth Abdnour Law, PLLC
1100 W. Saginaw Street, Ste. 4A-2
Lansing, Michigan 48915
517-292-0067
elizabeth@abdnour.com

Jacquelyn N. Babinski (P83575)
MI AECRES
PO Box 705
Ludington, Michigan 49431
231-794-2379
Dated: December 20, 2022          jbabinski@miaecres.org