# EXHIBIT A

| | |
|---|---|
| **From:** | MOAHR-GA <MOAHR-GA@michigan.gov> |
| **Sent:** | Thursday, October 13, 2022 2:11 PM |
| **To:** | Elizabeth Abdnour; ediaz@mpas.org; msickon@mpas.org; jbabinski@miaecres.org; raichoudhurira@kalamazoopublicschools.net; Bullinger, Jordan M.; kilijic@clarkhill.com; Eggleston, Bethanie (MDE); MDE-AdminLaw |
| **Subject:** | 21-027515 D.L. v Kalamazoo Public Schools |
| **Attachments:** | 21-027515 D.L. v Kalamazoo Public Schools - Decision and Order.pdf |
| | |
| **Sensitivity:** | Confidential |

**[External Message]**

Good afternoon,

Attached is ALJ St. John's Decision and Order in the above captioned matter.  Please let me know if you have any questions.

Verna Curtis
517-582-1338
Legal Secretary
Michigan Office of Administrative Hearings and Rules
611 W. Ottawa Street
Lansing, MI 48933
Main: MOAHR-GA@michigan.gov
Personal: Curtisv1@michigan.gov

DISCLAIMER: This message (including any attachments) may contain confidential information intended for a specific individual and purpose & is protected by law. If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**STATE OF MICHIGAN**
**MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES**

| | |
|---|---|
| **IN THE MATTER OF:** | **Docket No.: 21-027515** |
| **D.L.,**  **Petitioner** | **Case No.:   DP-21-0038** |
| **v** | **Agency:    Education** |
| **Kalamazoo Public Schools,** | **Case Type: ED Sp Ed Regular** |
| **Respondent** | **Filing Type: Appeal** |

_____/

**Issued and entered**
**this 13th day of October 2022**
**by: Michael J. St. John**
**Administrative Law Judge**

## DECISION AND ORDER

### PROCEDURAL HISTORY

This matter concerns a due process hearing request/complaint under the Individuals with Disabilities Education Act (IDEA) 20 USC 1400 *et seq*.   On or about October 22, 2021, Petitioner filed a due process request/complaint (Complaint) with the Michigan Department of Education (MDE).   MDE forwarded the Due Process Hearing Request to the Michigan Office of Administrative Hearings and Rules (MOAHR) for hearing. It was assigned to Administrative Law Judge (ALJ) Michael J. St. John.

On November 4, 2021, Respondent and then-Respondent intermediate school district (ISD) filed motions to dismiss.  On November 8, 2021, Petitioner filed a response and on November 12, 2021, Respondents filed replies.

A prehearing conference was held on November 16, 2021.

On November 18, 2021, Petitioner filed their proposed issues for hearing.   On December 3, 2021, Respondents filed objections to Petitioner's proposed issues and moved to quash Petitioner's proposed subpoenas. On December 6, 2021, Respondents filed objections to Petitioner's proposed subpoenas.

On December 3, 2021, Respondents MDE and Dr. Rice filed their Motion for Summary Disposition.   On December 17, 2021, Petitioner filed their response to MDE's and Dr. Rice's Motion for Summary Disposition.

21-027515
Page 2

On December 20, 2021, an Order was issued dismissing the ISD and the Michigan Department of Education as Respondents. The December 20, 2021, Order also limited the issues to claims brought under IDEA within two years prior to the filing of the Complaint. On January 4, 2022, Petitioner filed a Motion for Reconsideration of the December 20, 2021, Order. On January 7, 2022, that Motion was denied.

On January 6, 2022, a Final Prehearing Conference was held. The hearing was held as scheduled on January 10, 11, 12, and 13, 2022. Attorneys Erin Diaz, Mitchell Sickon, Elizabeth Abdnour, and Jacquelyn Babinski appeared on behalf of Petitioner Student. Attorneys Michael Bullinger and Katie Ilijic[1] appeared on behalf of the Respondent.

At the conclusion of the hearing, a post-hearing briefing schedule was ordered, but later modified/adjourned at the joint request of the parties. Each party submitted timely post-hearing briefs and replies on May 4, and 18, 2022 respectively, and the record was closed on May 18, 2022. On July 28, 2022, the resolution period was extended to August 31, 2022, which in turn extended the decision deadline to Monday, October 17, 2022.

## EXHIBITS

Petitioner offered the following exhibits (numbers) which were admitted without objection unless otherwise noted:

1. Pediatric Neuropsychologist (PN) CV
2. Neuropsychological Evaluation[2]
3. Special Education Expert CV
4. April 17, 2012, MET[3]
6. January 23, 2018, REED
7. September 28, 2020, REED
15. January 8, 2019, IEP[4]
16. April 6, 2019, IEP[5]
17. October 16, 2019, IEP
18. September 23, 2020, IEP
19. October 12, 2020, IEP
20. Discipline Logs[6]
22. Conduct Referral Reports
23. October 16, 2019, Manifestation Determination

---

[1] Attorney Ilijic was admitted pro hoc vice on January 4, 2022.

[2] Exhibit 2 was admitted over Respondent's hearsay and relevance objections.

[3] Exhibit 4 was admitted over Respondent's relevance objection.

[4] Exhibit 15 was admitted over Respondent's relevance objection.

[5] Exhibit 16 was admitted over Respondent's relevance objection.

[6] Portions of Exhibit 20 (documents relating to incidents that occurred prior to the 2018-2019 school year) were admitted over Respondent's relevance objection.

21-027515
Page 3

24. October 16, 2019, MDR[7]
25. October 16, 2019, IEP
26. October 12, 2020, IEP (as provided on June 9, 2021)
27. October 12, 2020, IEP (as provided on December 17, 2021)
28. October 23, 2019, BIP
29. April 16, 2019, Positive Behavior Support Plan (PBSP)[8]
44. Personal Curriculum (Biology A)
46. Various Email correspondence (15 pages)
49. School Psychologist CV[9]
51. April 16, 2012, Teacher Anecdotal Report

Petitioner's remaining exhibits (5, 8-14, 21, 30-43, 45, 47, 48, 50, and 52-53) were not offered. These exhibits are not part of the record.

Respondent offered the following exhibits (R-numbers), which were admitted without objection:

R-8     Spring 2020 Communication Log
R-9     April 14, 2020, email from Teacher 1 to Student
R-10    April 21 and 22, 2020 email chain between Teacher 1 and Student
R-11    April 21, and 22, 2020 email chain between Teacher 1 and Student
R-19    May 7, 2020, email from Teacher 1 to Student
R-23    June 8 and 9, 2020 emails between Teacher 1 and Student
R-27    2020-2021 Communication Log
R-33    September 9 and 21, 2020 emails between Teacher 1 and Student
R-51    October 6, 2020, email and Progress Reports
R-58    October 12, 2020, email from Transition Coordinator to Student
R-75    November 19, 2020, emails between Teacher 1 and Student
R-100 Meeting Video Recording
R-130 (Bus) Transportation List
R-131 Equity Cohort Sign-In/Sign-Out
R-150 State Complaint Investigation Decision
R-158 April 8, 2021, emails between Teacher 1 and Student
R-186 Student's Transcript
R-187 June 7, 2021, email from between Teacher 1 to Student
R-189 June 9, 2021, IEP[10]
R-195 Transition Coordinator CV
R-196 ISD Director CV

---

[7] Exhibit 24 was admitted over the Respondent's relevance objection.

[8] Exhibit 29 was admitted over the Respondent's relevance objection.

[9] Exhibit 49 was offered by the Respondent but admitted as Petitioner's exhibit. It is therefore not identified in Respondent's list of offered or admitted exhibits.

[10] Exhibit R-189 was offered by Petitioner but admitted as Respondent's exhibit. It is therefore not identified in Petitioner's list of offered or admitted exhibits.

21-027515
Page 4

R-198 Director of Special Education CV R-199 Teacher 1 CV

The remaining exhibits (R-1-7, R-12-18, R-20-22, R-24-26, R-28-32, R-34-50, R-52-57, R-59-74, R-76-99, R-101-129, R-132-149, R-151-157, R-159-185, R-188, R-190-194, and R-197) were not offered. These exhibits are not part of the record.

## ISSUES

1. Did Respondent fail to conduct initial and follow up comprehensive educational evaluations, including cognitive functioning, behavioral, and transition assessments?

2. Did Respondent fail to create appropriate postsecondary goals?

3. Did Respondent fail to provide appropriate accommodations and related services to the Student?

4. Did Respondent fail to appropriately address the Student's behaviors that were impeding the Student's learning?

5. Did Respondent fail to provide the Student with assistive technology devices and services?

## APPLICABLE LAW

The Code of Federal Regulations, 34 CFR 300.39(a)(1), defines "special education" as follows:

> Special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including—
>
> (i)  Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
>
> (ii)  Instruction in physical education.

Michigan Administrative Rule for Special Education, R 340.1701c(c) defines "special education" as follows:

> "Special education" means specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential. Special education includes instructional services defined in R 340.1701b(a) and related services.

**21-027515**
**Page 5**

The Code of Federal Regulations, 34 CFR 300.39(b)(3), defines "specially designed instruction" as follows:

> Specially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—
>
> (i)  To address the unique needs of the child that result from the child's disability; and
>
> (ii)  To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

Students protected by the provisions of IDEA are entitled to be appropriately identified, evaluated, placed, and provided a free appropriate public education (FAPE) that includes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 20 USC 1400(d); 34 CFR 300.1.

In *Board of Education of Hendrick Hudson Central School District v Rowley,* 458 US 176 (1982), the U.S. Supreme Court articulated the two bases for assessing the provision of FAPE. The first was whether the school district had complied with the procedural requirements of the Act, and the second was whether the student's Individualized Educational Program (IEP) was "reasonably calculated" to enable the student to receive educational benefits. *Id.* at 206-07.

In assessing whether a student's IEP was reasonably calculated to enable the student to receive educational benefits under *Rowley*'s second basis above, our Sixth Circuit Court of Appeals noted that nothing in *Rowley* precludes the setting of a higher standard than the provision of "some" or "any" educational benefit and held that the IDEA requires an IEP to confer a "meaningful educational benefit gauged in relation to the potential of the child at issue." *Deal v Hamilton County Bd of Ed*, 392 F3d 840, 862 (CA 6, 2004).

Nevertheless, the IDEA requirement that school districts provide disabled children with a free appropriate public education does not require that a school either maximize a student's potential or provide the best possible education at public expense. *Doe v Tullahoma City Schools,* 9 F3d 455 (CA 6, 1993); *Fort Zumwalt Sch Dist v Clynes,* 119 F3d 607, 612 (8 CA, 1997), *cert den,* 523 US 1137 (1998). In *Endrew F. v Douglas County Sch. Dist. RE-1*, 580 U.S. 386; 137 S Ct 988, 999 (2017), the US Supreme Court expanded its explanation of FAPE in *Rowley* and stated that to provide a FAPE, the IDEA requires an educational program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

The primary responsibility for formulating the education to be accorded a disabled child, and for choosing the educational method most suitable to the child's needs, was left by IDEA to state and local educational agencies in cooperation with the parents or guardians of the child. Reviewing courts may not substitute their own notions of sound educational policy for those of the school authorities which they review. *McLaughlin v Holt Pub Schs*, 320 F3d 663 (CA 6, 2003).

In determining whether the District provided a free appropriate public education in the least restrictive environment for the student in this case, it must first be asked whether the District has complied with the procedures set forth in the IDEA in developing the IEP, and second, whether the IEP developed through those procedures was reasonably calculated to enable the student to receive a meaningful educational benefit gauged in relation to the student's potential. *Rowley*, 458 US at 206-07; *Deal*, 392 F3d at 862.

34 CFR 300.116 provides:

> In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that-
>
> (a) The placement decision-
>
>   (1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and
>
>   (2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.114 through 300.118;
>
> (b) The child's placement-
>
>   (1) Is determined at least annually;
>
>   (2) Is based on the child's IEP; and
>
>   (3) Is as close as possible to the child's home;
>
> (c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled;

21-027515
Page 7

(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

(e) A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.

## SUMMARY OF TESTIMONY

The following is a summary of the testimony of the witnesses. Any opinion is that of the witness.

PN, (PN) Ph.D., Pediatric Neuropsychologist

1. PN has a Ph.D. in clinical psychology and completed an internship and fellowship in neuropsychology.

2. PN is currently the director of neuropsychology at an out-of-state Children's Hospital. PN is licensed as a psychologist in Michigan and Ohio.

3. PN has testified as an expert witness in prior due process hearings and forensic criminal matters.

4. PN has conducted about 4,000 neuropsychology evaluations over the course of her career.

5. PN is an expert witness in pediatric neuropsychology.

6. PN served as a consultant for special needs children for a school district for more than a decade.

7. PN evaluated the Student in August 2021. She reviewed the Student's school records and interviewed the Student and his mother.

8. PN's evaluation (Exhibit 2) included a battery of tests, and she believes that her evaluation was valid.

9. The Student has a specific learning disorder in mathematics and reading; he has Attention Deficit Hyperactivity Disorder (ADHD) and suffers from Post-Traumatic Stress Disorder (PTSD).

10. The Student has an atypical profile with specific deficits but areas of average functioning. The Student is capable of reading at an 8th grade level but the unevenness of his profile results in him having difficulties learning.

21-027515
Page 8

11. A school psychological evaluation would have (and did) pick up on differences in the Student's levels of functioning.

12. The Student has relative strength in visual learning and relative weakness in verbal and language skills.

13. The Student has experienced trauma in his family through losses, and in school through academic shame.

14. The school district could have provided accommodations to the Student to focus on the Student's areas of strength by providing text to speech and a reading interventionalist to assist the Student. The district could have also provided accommodations to help the Student remain on task.

15. Conceptually, the Student is age appropriate. He is capable of understanding concepts, particularly if accompanied by visual information. The Student's limited vocabulary has limited his ability to extract verbal information.

16. PN would expect the Student to obtain higher levels of reading and math achievement given his level of functioning.

17. The Respondent used a very effective reading method, but given the Student's specific deficits, it was not successful.

18. The Student's 3rd grade teacher's report (Exhibit 51) indicated concerns about the Student's behaviors. Based on those concerns, PN would expect further evaluation to have been performed.

19. ADHD, by definition, has symptoms present by age seven; although first diagnosed by PN, the Student has had ADHD the entirety of his school career. The Student would have benefited from accommodations and assistive technology in the school.

20. PN believes that the Student could have learned more if he had been provided the appropriate accommodations and if the district had avoided shaming the Student.

21. With a history of shame in academic learning, it may take years for the Student to be able to learn up to his level of potential. This will take extensive counseling for at least two years.

22. PN received the Student's educational records from the Student. PN typically reviews medical records as part of her evaluations but did not in this case.

23. PN's evaluation of the Student took about five-and-a-half hours.

21-027515
Page 9

24. PN did not speak with the Student's teachers or anyone at the Respondent school district.

25. PN did not diagnose the Student with post-concussive effects.  The enduring effects of the Student's concussions would need to be evaluated as part of a rule-out diagnosis.

26. The following accommodations for the Student were appropriate:

    a.  Extended time to complete tests and assignments.
    b.  Tests/quizzes in small groups and read aloud.
    c.  Preferential seating free from distractions.
    d.  Shortened accommodated tests and assignments.

27. All the accommodations in the Student's most recent IEP were appropriate for the Student.

28. Student was eligible for special education, while in school, because of his specific learning disabilities.  PN doesn't disagree with this diagnosis.  PN does not believe that the Student should have been eligible as other health impaired (OHI).

29. The Respondent was missing information in their evaluation and implementation of special education services for the Student.

30. Although the Respondent's accommodations were appropriate, they were lacking in implementation.  A different, visual-based, reading program would have been more appropriate for the Student.

31. PN was compensated for her time by the Petitioner.

32. Even though she did not review the Student's medical records, PN believes that her testing and observations were valid.  There was no indication that the Student was malingering.

33. Based on the information available to the Respondent, the Student's accommodations were appropriate, at least on paper.

34. PN believes that Respondent should have performed a comprehensive psycho-educational evaluation of the Student.

35. PN believes that the contents of the Student's IEPs may not have been fully communicated to the Student and his mother based on the Student and the mother's understanding of the content of the EPs.  Similarly, PN believes that the contents of the IEPs may not have been communicated to the Student's teachers

based on the teachers' interactions with the Student (i.e., making the Student read aloud to the class).

Petitioner's Special Education Expert (Expert), Ph.D. in Special Education

36. Expert is a professor of special education. He is currently a neutral fact finder in a class action lawsuit. He has master's and doctorate degrees in special education. He has taught special education administrators in U.S. territories and worked with school districts on using data to make informed decisions on the placement of students. He worked as a hearing officer in Pennsylvania for a decade.

37. Expert testifies in due process hearings about once a month.

38. Expert has performed psychological testing as part of students' IEPs.

39. Expert is an expert in special education and IEP development and implementation.

40. Expert would expect evaluations of the Student to be in line with what teachers are reporting as areas of concern for students.

41. The initial evaluation is essential to ensure that there is a baseline for the Student so that appropriate accommodations and programming can be provided to the Student.

42. Expert has reviewed the Student's education records.

43. The Student was not making annual progress as evidenced by his yearly IEPs, which stayed basically the same year to year.

44. The Student's January 23, 2018, REED (Exhibit 6) lacked sufficient information and evaluation to allow the Respondent to provide appropriate special education services to the Student.

45. Expert would have expected additional information from the Student's teachers and additional testing administered to the Student to assess the Student for special education services.

46. Based on the concerns of a teacher in 2012 (Exhibit 4 and Exhibit 51), Expert would have expected an evaluation of the Student's social-emotional skills. This was not done; only concerns with the Student's reading skills were addressed. The Student was not assessed for cognitive functioning or behavior issues.

47. Expert was concerned that the Student's goals were the same year after year.

48. Expert reviewed PN's evaluation (Exhibit 2) and concluded it was a comprehensive evaluation of the Student.

49. Expert is unsure why the Student was enrolled in classes like algebra, geometry, world history, and African history given his 3rd grade reading level.

50. Expert believes that given Student's cognitive abilities, if the Student had received appropriate interventions, he would be able to read at a higher level.

51. When a student doesn't progress, the district needs to do different interventions. Expert is unsure whether the Student was making academic progress because there were no further evaluations of the Student.

52. Expert would have recommended a different reading program, a different level of intensity, or a different reading group. Something needed to change in light of the Student's lack of progress. Here, the district did not make the changes because the district was unaware of the lack of progress because they were not doing additional evaluations and assessments of the Student.

53. Expert does not believe that the Respondent's IEPs of the Student satisfy an offer of FAPE. The information contained therein was not current (because additional evaluation and testing was not done) and so there was no way for the IEP team to establish appropriate goals and accommodations/services.

54. Progress toward goals on the Student's October 12, 2020, IEP (Exhibit 26 and Exhibit 27) is not reported.

55. Expert is unsure how the Student graduated given his low reading and math functioning scores and abilities.

56. Expert does not believe that the Respondent provided the Student with FAPE.

57. Respondent provided few accommodations to the Student. The October 2020 IEP included accommodations that were appropriate but did not go far enough to address the Student's needs.

58. Although the Student's IEPs indicate that the use of positive behavioral interventions and supports were included, none were delineated in the Student's IEPs.

59. When teachers provide a student with different accommodations in different classes, it can lead to student frustration.

60. Expert believes that the IEP team needed to meet to determine whether the Student's behavior was a result of the Student's disabilities and how those disabilities were impacting the Student's academic studies. Respondent should have evaluated the cause of the Student's behaviors.

61. The Student's Behavior Intervention Plan (BIP) (Exhibit 28) is not very comprehensive.

62. Although the 2018 behavior plan (Exhibit 29) included data collection from teachers, the 2019 BIP (Exhibit 28) did not include any such data.

63. The Student and the Student's family were responsible for most of the Student's transition planning.

64. Expert did not speak with the Respondent's school personnel, the Student, or the Student's mother; he only reviewed the Student's educational records that he received.

65. Although he has completed or taught the coursework to become a behavioral analyst (BCBA), Expert has not completed the required 1,500 or 2,000 hours of direct service to students, so he is not a Board-Certified Behavior Analyst (BCBA).

66. Petitioner is compensating Expert for his records review and testimony.

67. Expert would have expected more explanation about why the Student's disability was not the cause of the behavioral incident that led to his suspension.

68. A school social worker or counselor would have helped the Student make it through his academic day at school and make progress toward his academic goals. Expert would have expected a behavioral goal in the Student's IEP to be to follow directions and not be defiant towards staff.

69. Expert believes it was clear that the Student had behavioral issues that were not being addressed by the Respondent school district.

70. The Student will need intensive math and reading instruction to reach his full potential. This would take several (3+) years.

#### Student

71. Student attended high school with the Respondent and played football as a defensive lineman. In his senior year, Student was only allowed to play a few games because he was suspended from playing football for fighting.

72. Student was recruited by a junior college and a division III school to play football.

73. Student enrolled in the community college that recruited him, but he was unable to sign up for classes by himself. He left the program.

74. Student had a concussion his 10th grade year but had no long-lasting effects.

21-027515
Page 13

75. Student was unable to listen to or remember football plays, so his high school teammates helped direct him where to go.

76. Student had two favorite teachers: for math and English. These teachers were his favorites because they made the classes easy by sending him to his coach or to a desk in the hallway.

77. Student had anger issues at school.

78. Student did not like reading out loud because he didn't know how to pronounce words, would make mistakes, and would stutter. Student believes that he reads well silently to himself.

79. Student admitted to cheating in his courses; he did this because the work was too difficult for him to do on his own. Student did not cheat in his math or English classes because those teachers watched him.

80. Some teachers helped him with his assignments, but some did not.

81. Student stopped doing work in his biology class because he knew that he was going to fail.

82. Student was having difficulty keeping up with the pace of material being introduced in his classes.

83. When the football season ended in October, the Student stopped focusing on and doing his homework.

84. Student's online IEP teacher would help him keep track of his grades and email Student and his mom when his grades were slipping.

85. Student enjoyed his Read 180 course and teacher and would work with him for assistance with his other classes. Student dropped the Read 180 course to take a gym class.

86. Student had a co-teacher in most of his classes and the co-teacher would take the special education students and read the test to them in a small group.

87. Student's credit recovery program was difficult – it was all tests.

88. Student's cousins and football teammates did much of the Student's school work for him.

89. The summer before his senior year, the Student's uncle died as a result of gun violence. This caused the Student to feel angry and to stop being social.

21-027515
Page 14

90. The Student wants to do construction trades for a career but hasn't investigated how to do that because he does not know how to start.

91. The Student wanted to graduate on time, and was told that if he waited a year, it wouldn't look good for football recruiting. The Student's mother also told him to finish at his school and not "take the easy route" by transferring to another school.

92. A week before he graduated from high school, one of his teachers told the Student that he wasn't going to make it in college if he didn't stay in high school for another (fifth) year. The Student wanted to prove him wrong.

93. The Student does not feel like he earned his diploma because he did not do all of the course work.

94. During his senior year, the Student worked seven hours a day, every day of the week. He would do his schoolwork on the computer while at his job.

95. The Student cannot do multiplication or division. He can read but has difficulty following the written word when reading. He understands a story when it is read to him.

96. The Student did not like tutoring or make up sessions while in school. If offered tutoring or remediation now, however, he would do it because he knows that he needs it.

Student's Mother (Mom)

97. The Student is an outstanding, responsible young man. The Student first started receiving special education services as part of the Head Start and early on programs.

98. Mom never really understood the IEP meetings, supports, or accommodations. She feels bad that she was not able to help the Student with his studies and what he needed.

99. Mom felt like the materials read to the Student were not helpful and did not help him learn.

100. Mom first learned about the Student's disabilities over the previous summer (i.e., summer of 2021): ADHD, stress disorder, and reading and math learning disabilities. Mom never knew what the Student's disabilities were prior to PN's evaluation.

101. Mom felt like the doctors brushed her off and the school told her to talk with the doctors.

21-027515
Page 15

102. Mom felt that the Student was not on the same level as other children the same age. Mom knew that Student had disabilities; she was just not sure what those disabilities were.

103. Mom first learned from PN that the Student could learn to read with assistance.

104. Mom got additional tutoring help for the Student from a local charity because she felt that the school was not doing enough. The Student could have done better with the tutoring; unfortunately, the Student's heart wasn't in it and so he did not give his full effort towards tutoring.

105. The only accommodations afforded to the Student that Mom was aware of were extended time, reading text aloud, and being able to go to the coach for assistance.

106. Mom went to the yearly accommodation meetings when she was able to attend. She always wanted to attend even though she didn't understand what was being said. Sometimes, though, something would come up and she wouldn't be able to attend.

107. Mom never agreed to forgo additional evaluations of the Student.

108. The Student's teachers addressed the Student's restlessness in middle school.

109. The Student received a concussion playing football in high school. Mom is unsure when this occurred. The Student's high school coach told Mom to take the Student to be evaluated by a medical professional.

110. Mom does not remember seeing progress reports on how the Student was doing on his IEP goals other than what was provided to her at the IEP meetings (or after the meeting if she wasn't able to attend the meeting).

111. Mom does not believe that her son was making progress learning to read from the 3rd grade onward. At 20 years old, the Student still needs Mom's help with reading.

112. Watching the Student struggle with reading was difficult for Mom. Mom struggled with math and didn't graduate from high school. Mom tried to help the Student be successful but was unable to really help him.

113. The Student had disciplinary issues in class. This was because he was embarrassed in class sometimes; he did not like to read out loud in class because other students would make fun of him. The Student also got into trouble for leaving the classroom.

114. Mom would go to the school, when available and called upon, to discipline the Student if he was having behavioral issues.

21-027515
Page 16

115. Mom didn't graduate from high school, in part, because she did not take school seriously.

116. Mom wanted her son to graduate in 2021 because she had previously held her son back a grade in Kindergarten.

117. When Mom and the Student were told that the Student did not have enough credits to graduate, the Student buckled down and worked hard to complete his courses in the credit recovery program.

118. Mom does not feel like the Student had the skills necessary to graduate.

119. The Student's uncle's death made the Student quieter and more reserved and he kept to himself. The Student's cousin's death made the Student a follower in a bad crowd and caused him to stay up all night, which affected his sleep schedule. Mom told the school about the Student's uncle's and nephew's deaths; the school did not offer any social work or counseling services.

120. Mom doesn't remember raising issues with the school about the Student's progress. She had previously addressed the school removing the student from the Reading 180 program.

121. Mom would reach out to the Student's coach when she had concerns and the coach would help address issues.

Psychologist, School Psychologist (Psychologist) for Respondent

122. Psychologist has worked for the Respondent as a school psychologist since 2014. She was previously a special education teacher. She has a master's degree and a certificate of advanced graduate studies in school psychology. She is a licensed school psychologist in Michigan.

123. As a school psychologist, Psychologist administers and scores cognitive testing to determine eligibility for special education. Social workers perform the social-emotional tests.

124. Psychologist worked with the Student at both middle and high school.

125. Psychologist performed the January 23, 2018, REED for the Student (Exhibit 6). The REED was to determine ongoing eligibility for special education only. That REED showed that Student was doing well in the Read 180 class but poorly (Ds and Fs) in his other courses.

126. Psychologist attended the December 2020 meeting (Exhibit R-100). At that meeting, Psychologist noted that the Student was reading at a 3rd grade level.

21-027515
Page 17

127. Psychologist understood from the course teacher that the Student withdrew from the strategic reading course.

128. The assessments show the Student's level of functioning. The assessments do not test the Student's cognitive level; the Student may be able to achieve at a higher level.

129. The Student's reading comprehension was at the 50th percentile, which is significantly higher than his ability to read out loud, which was at the 5th percentile.

130. There are several other areas of the WIAT-III test that Psychologist did not test the Student on because no one addressed a concern in those areas.

131. The WIAT-III in math, the ORQ test in reading, and classroom assessments were the entirety of the testing that Psychologist performed on the Student.

132. In 2015, when the Student was in the 5th grade, he read at a 2nd grade level. In 2018, when the Student was in the 8th grade, he read at a 3rd grade level.

133. Psychologist felt that the Student's accommodations and programs were appropriate.

134. Psychologist did not do cognitive assessments on the Student because they were not required, and she did not believe that they were necessary.

135. Psychologist believes that the Student's disciplinary issues were being addressed by the Student's behavior plan.

136. The Student's academic performance was being impacted by lack of attendance and missing assignments.

137. If behavior is affecting a student's academic progress, the school needs to address the student's behavior. Behavioral support can be, but doesn't need to be, documented on the student's IEP or provided by a social worker. In the Student's case, the behavioral support was provided by the Student's football coach and was not included on the Student's IEP.

138. It is important to understand the function of a Student's behavior so that a plan can be corrected. A Functional Behavioral Assessment (FBA) assesses student behavior. An FBA was not performed on the Student.

139. Psychologist has completed over 500 evaluations for the Respondent since 2014. She is an expert in school psychology.

21-027515
Page 18

140. The 2018 REED (Exhibit 6) was only administered to determine if the Student needed additional assistance and support in math.  There was no evaluation of the Student's eligibility for special education or for deficits in other areas.

141. Curriculum-based assessments are helpful in determining how well a student is doing in the classroom.

142. Because the Student was able to achieve and maintain his goals and objectives in reading, new goals and objectives were implemented.

143. Neither the Student nor the parent (Mom) reported to Psychologist that the Student had a concussion, trauma, or a death in the family.

144. Psychologist agreed with the REED team's opinion that there was sufficient data to provide support to the Student for his demonstrated academic skills, which were below grade level.

145. No discipline was reported during the Student's senior year.  Having only five removals per year is not particularly concerning to Psychologist.  Because the Student had no removals during his senior year, there was no need to address any underlying behavior.

146. Because the Student was capable of producing adequate grade level work during football season as a motivator, the Student was capable overall of completing adequate grade level work.

147. The Student's mother indicated that Student could be lazy when it comes to doing classwork.

148. There was discussion about the Student going on to transition services because the Student was not on track to graduate at the end of the 2020-2021 school year.

149. The Student's October 12, 2020, IEP (Exhibit 19) included a work completion goal from 71% to 85%.  This was an appropriate goal because lack of work completion was affecting the Student's academic progress.

150. There is no progress reported on this goal (work completion of 71-85%) in Student's IEP because the progress was being reported on a distance learning plan.

151. Student was not disciplined after February 26, 2020, which was shortly before the district went remote because of COVID-19.

152. The Student's 2019 and 2020 IEPs (Exhibit 17, Exhibit 18, and Exhibit 19) had identical goals, except the 2019 reading accuracy goal was for 80% work completion rather than 85%.

21-027515
Page 19

Transition Coordinator (TC) for Respondent

153. TC has been the Respondent's Transition Coordinator since 2016. In that role, he attends IEP meetings, connects students with potential employers, and helps families achieve post-secondary goals.

154. TC is a special education teacher with endorsements in cognitive impairments, learning disabilities, and emotional impairments. He has a B.S. and a M.A. in special education.

155. TC was a teacher in self-contained classrooms and a teacher in the transition program before becoming the coordinator.

156. The only transition assessment for the Student was the ESTR-j Revised and the informal student interviews. The ESTR-j Revised was given twice: in 2018 and again in 2020.

157. The career/employment and post-secondary education/training sections of the Students' IEPs (Exhibit 16, Exhibit 17, and Exhibit 19) are essentially the same each year.

158. All special education students going through the transition process take the ESTR-j assessment.

159. There are additional assessments available, some of which the Student took as part of one of his career-readiness courses.

160. The Student's case worker would also ask questions about careers and transition planning as part of the career-readiness interview.

161. TC believes that the information that the IEP team had was sufficient to address the Student's transition needs.

162. The September 2020 IEP amendment was to include the contingency/distance learning plan. Transition planning was not amended during this meeting.

163. The Michigan Career Technical Institute (MCTI) requires basic math skills for the construction program.

164. The Student lacked the necessary math and reading skills to enroll in MCTI programs unless he made progress in reading and math.

165. All the Student's transition planning was to be performed by the Student and the Student's family – school staff were not providing support.

166. TC is unsure how the transition goals and objectives were measured. He was not responsible for this goal: the special education and general teachers were.

167. TC had no reason to believe that the data from the prior career inventories was invalid or stale.

168. Neither the Student nor the Student's parent attended the October 2020 IEP team meeting.

169. The data collected from the career assessment was not the only data considered by the team at the IEP meetings. Progress on the Student's goals was also considered at that meeting.

170. The Student expressed an interest in attending community college for construction trades; this is where that goal originated.

171. The Student's work completion goal is also a transition goal.

172. TC sent the Student an email on October 12, 2020 (Exhibit R-58) asking to speak with him about his transition. TC never received a response to his email.

173. In December 2020, TC learned that the Student changed his transition plan to playing football at a university.

Special Education Teacher (Teacher 1) for Respondent

174. Teacher 1 has a bachelor's degree in history and a master's degree in special education. He is certified to teach history, English, and special education - learning disabilities.

175. Teacher 1 first met the Student as a sophomore in a co-taught history class. The Student struggled behaviorally to meet classroom expectations and school-wide rules. Frequent reminders of expectations, frequent re-direction, one-on-one conferences (in the hallway), and involving the Student's football coach were all utilized as supports to improve the Student's behavior.

176. The supports were not successful for the Student; he did not pass his sophomore history class.

177. The Student was transferred onto Teacher 1's caseload during the Student's junior year.

178. Teacher 1 informed staff about the Student's accommodations by emailing the Student's teachers.

179. Teacher 1 attended the Student's October 16, 2019, manifestation determination review (MDR) meeting (Exhibit 23). Teacher 1 reported that the Student was struggling to make progress toward his academic goals and objectives primarily as a result of his failure to follow classroom and building rules, his poor attendance, and his behavior in class.

180. An IEP team meeting was held after the MDR meeting. This meeting was held to review the Student's progress and ensure that there was a solid plan in place to help the Student meet his goals.

181. The Student was enrolled in a minimum of one co-taught class per trimester. Typically, though, students have additional co-taught core classes (math, science, English, and social studies).

182. The Student had a Behavior Intervention Plan (BIP) implemented on October 23, 2019, following the MDR and IEP. Teacher 1 shared the BIP with the Student, the Student's family, and with the Student's teachers and building administrators.

183. The BIP included interventions of preferential seating, not calling out the Student in front of the whole class, one-on-one work, small group instruction, using positive praise, and ignoring negative behavior. The Student would be removed from class only following three private verbal reminders.

184. Classes ceased on March 13, 2020, due to the pandemic. On April 20, 2020, online instruction commenced and continued for the remainder of the school year.

185. On April 14, 2020, Teacher 1 emailed the Student about online learning (Exhibit R-9).

186. If students did not have internet access, packets were available to students. The Student participated through the internet.

187. The Student reached out to Teacher 1 about issues he was having with the Google classroom work. Teacher 1 spoke with the teacher who was going to send out a needed code to the Student (Exhibits R-10 and R-11).

188. During the spring 2020 trimester, students did not receive grades, only credit or no credit. To earn credit, only effort was required. Attendance was not taken into consideration because many students did not have reliable internet access or had started to work during the day and so were not available during the day.

189. Teacher 1 interacted with the Student several times during the spring of 2020 (Exhibit R-8). Teacher 1 also emailed the Student's teachers to check in on the Student's progress in their classes.

190. Teacher 1 reached out to the Student's biology teacher and co-teacher about the Student needing help with reading. Both teachers indicated they would be willing to work with the Student in office hours or through a meeting.

191. Teacher 1 also communicated with the Student's mother on May 26, 2020, telling her that the Student was not communicating with either him or his teachers. The Student's mother indicated that she was upset with the Student, could not control him, that he was being lazy, and that he was always playing on his phone. Teacher 1 also reached out to the football coach.

192. When teachers had concerns about the Student, they would reach out to Teacher 1. When this happened in May 2020, Teacher 1 emailed the Student (Exhibit R-19).

193. Teachers had office hours during remote instruction where teachers were available to students if students were having difficulty with any of their classes.

194. On June 9, 2020, Teacher 1 emailed the Student to complete additional science work, which he did.

195. The Student earned credit in all of his classes during the spring of 2020.

196. Students had five periods per trimester, but the Construction Trades class took two of those periods.

197. Teacher 1 remained the Student's caseload teacher for the 2020-2021 school year. Teacher 1 also co-taught the Student in classes his senior year.

198. Teacher 1 kept a log of communications with the Student during the Student's senior year, 2020-2021. The log (Exhibit R-27) only includes communications through February 2021, but Teacher 1 continued to communicate with the Student throughout the year, up until graduation.

199. On September 11, 2021, Teacher 1 and the classroom teacher read the assignment to the Student and reviewed instructions with him. Teacher 1 noted that this worked well.

200. Teacher 1 sent students weekly progress reports so that students were aware of how they were doing in each of their courses. Weekly progress reports also served to remind students of missing assignments.

201. On September 29, 2021, the Student emailed Teacher 1 about not being comfortable sharing his work with other students. Teacher 1 emailed the teacher and the teacher responded that the Student was not attending classes and could just present his work to the teacher, not the whole class.

202. On Wednesdays, teachers taught social-emotional classes for students. Teacher 1 informed the Student of those classes (Exhibit R-33).

203. Teacher 1 was available to the Student to help the Student to read assignments and clarify any instructions. Teacher 1 did this for the Student. (Exhibit 6 page 7).

204. The Student did not attend group sessions consistently or frequently.

205. Football and graduation were motivating factors for the Student.

206. Teacher 1 offered to read tests to the Student and to go through the credit recovery tests with the Student. Teacher 1 also offered to set up speech-to-text on the Student's computer. (Exhibit 6, p 1).

207. Teacher 1 also offered Student a summer school program, but that meant that the Student wouldn't have graduated with his classmates in June 2021.

208. On April 29, 2020, the Student emailed Teacher 1 about difficulty reading the assignments in one of his classes. On April 30, 2020, Teacher 1 responded that he could help the Student and provided his cell phone number to allow the Student to text him to set up a time to meet. (Exhibit 46 pp 2- 4).

209. On November 19, 2020, the Student was removed from a class because he was set to take the scheduled test with Teacher 1's assistance (Exhibit R-75).

210. Teacher 1 administered the Student's ESTR-j transition assessment through a conversation with, and observations of and about, the Student.

211. The Student's reading goal decreased from 85% accuracy in 2019 to 80% accuracy in 2020 because that was felt to be a more appropriate goal given the Student's (lack of) progress in improving the Student's reading comprehension.

212. Teacher 1 provided updates on the Student's progress towards his IEP goals.

213. The Student and his family were concerned about the Student's reading skills and so an IEP team meeting was held in December 2020. The meeting participants discussed a strategic reading class focused just on remedial reading skills. A special education teacher's duties include providing reading instruction to help students improve their reading skills.

214. At the December 2020 IEP team meeting, Teacher 1 noted that taking the reading course would have postponed the Student's graduation. The Student would have taken the delayed classes in summer school or transition services.

215. The Student did not want to postpone his graduation – he wanted to graduate with his class in June 2021.

21-027515
Page 24

216. Teacher 1 believes that the Student's IEP was meeting the Student's needs. When the Student was putting in effort and attending classes, he was making progress toward his objectives and goals and toward graduation.

217. The Student graduated at the end of his senior year in June 2021.

218. Teacher 1 did not conduct a formal assessment of the Student's progress on his reading goal, but rather used informal assessments based on the Student passing his government class.

219. If the Student was not making progress on his goals, it would be up to Teacher 1 and the IEP team to make changes. This could have included a reading class and additional reading supports and resource room time. This was not done because this was not the Student's overall goal, which was to graduate on time.

220. The Student had a personal curriculum for his Biology A course. The Student could have had a personal curriculum in another class to allow additional time for the Student to take the remedial reading course.

221. Student did receive extra time and full credit for the course in question despite Teacher 1's email to the contrary.

222. Social work, psychology, and counseling services were not included in the Student's October 23, 2019, BIP (Exhibit 28).

223. The Student had 13 write-ups between the October 23, 2019, BIP and when school went remote (Exhibit 20). Seven of the write-ups were for the Student leaving the classroom. No FBA was done to determine the reason the Student left the classroom.

224. The Student did not attend the June 2021 IEP meeting, likely because the invitation was sent to the Student's school email address after the Student had graduated (Exhibit R-187).

225. Teacher 1 co-taught the Student's senior government class. In determining progress on the Student's reading goal in that class, Teacher 1 considered the Student's submissions in that class.

226. Teacher 1 and his co-teachers allowed the Student to turn in late work through the end of the semester without any penalty. All teachers were accommodating of students with disabilities.

227. Teacher 1 has no reason to dispute the validity of Student's high school grades. The Student did enough work to earn his grades and credits. There is at least some evidence that the Student submitted copied/plagiarized work.

21-027515
Page 25

Principal (Principal) of High School

228. Principal has both a B.S.W. and M.S.W. She has a secondary administration certificate. She is in her 9th year as the Principal of High School. She was previously an assistant principal for two years and the dean of students for five years prior to that. She worked for another district as a behavior specialist and counselor for five years.

229. High School has a program to assist students with social-developmental skills, including a big sibling and mentorship program. High School also had a mental health counselor and tutoring programs.

230. Principal was one of the Student's "safe people" that the Student could seek out if the Student was having issues. The Student also had good relationships with Teacher 1, Caseload Teacher, another teacher, and the football coach. The Student was very personable.

231. The Student was adamant that he wanted to graduate on time; he did not want to stay for a 5th year of high school or participate in transition services.

232. There were supports available to students having trouble with remote learning during the pandemic. The high school staff reached out to students that were not logging in regularly, were not doing well in courses, and to any students the teachers identified as having difficulty. By doing so, this also allowed students to have socialization. Staff also reached out to students with IEPs to assist with remote learning. These services were offered to the Student.

233. The Student attended only one learning hub (Equity Cohort), which affords students an opportunity to come into the school for assistance: on March 15, 2021, for three hours (out of a total of six hours offered that day).

234. Principal spoke with the Student about attending the learning hubs to help him stay on track to graduate. The Student was offered bus transportation for the Student to attend the learning hubs (Exhibit R-130). The Student did not show up at the bus stop and so the bus route was cancelled. Thereafter, the bus route was restarted at Student's request, but the Student still did not show up for bus transportation.

235. Principal has no reason to question the validity of the Student's high school grades or credits.

236. The Student had behavioral incidents: fights, tardiness, and refusal to follow instructions. The more serious incidents occurred outside of the classroom.

237. High School has a grief support group to help students dealing with losses. Those supports were offered to all students, including the Student. A violence-prevention group was offered to the Student.

238. High School has about 75 teachers, including about 11 special education teachers. There are about 1,700 students, including about 130 to 200 students receiving special education.

239. Tutors would not teach or work on reading specifically, but would help students with their homework, including reading assignments.

240. The Student's caseload teacher retired after the Student's 10th grade year, which is why the Student's caseload teacher changed.

241. At the December 2020 IEP team meeting (Exhibit R-100), Principal brought up her concerns about the credit recovery program and, particularly, the amount of reading.

Teacher 2

242. Teacher 2 has a bachelor's degree with a teaching emphasis and a master's degree in special education. She has endorsements in special education and is certified in Michigan. She has been a special education teacher at High School for more than 10 years. This is her 40th year overall as a special education teacher.

243. Teacher 2 taught the Student's intervention reading class in the 9th grade. As part of the classroom, she worked with the Student on his reading skills and one-on-one with his other school assignments.

244. The Student did not want to come to Teacher 2's class because he was ashamed to be in a special education class. When the Student was frustrated, Caseload Teacher would come to the class and work with the Student.

245. The intervention reading class also had supports to help the Student remain on task.

246. The Student did not test out of the intervention reading class but was frustrated with the class and did not want to be in the class because he was embarrassed. The Student could have continued in the class each year if he so desired because it is an elective course.

247. Teacher 2 participated in the December 2020 IEP to provide information about the Student's reading skills. The Student improved about one grade level in reading during the time that he was taking Teacher 2's intervention reading class.

248. The Student admitted at the December 2020 IEP meeting that he didn't want to remain in the reading class. The Student also noted that he made progress in the intervention reading class.

249. Teacher 2 would help the Student with schoolwork when the Student asked for it, primarily in history.

250. At the December 2020 IEP meeting, Teacher 2 suggested that the Student re-enroll in the reading intervention program: Fast Forward.   Teacher 2 was concerned that adding this additional remedial reading program, of at least 30 minutes per day, would be too much for the Student to complete given his goal of completing all of this graduation requirements.  The Student did not participate in the remedial reading program during his senior year.

251. Teacher 2 has taught the remedial reading course for over 10 years during which she has worked with hundreds of students.

252. The Student was able to read at about the 4th grade level at the start of his 9th grade class and improved to about the 5th or $5.5^{th}$ grade level by the end of the intervention reading course.

253. The Student's goal was to be a professional football player.  Teacher 2 talked with the Student about having a secondary goal and learning to read so that he could read his contract.

254. The Student told Teacher 2 that he loved the construction trades program and enjoyed building a house.

255. Teacher 2 has four sections of the intervention reading class, each with about 15 to 20 students per class.

256. Teacher 2's strategic remedial reading class was appropriate for the Student.  The Student could have continued his reading skills if he had remained in that class.

257. Teacher 2 would expect her assessment of the Student's reading to be in the Student's IEPs – it is not.

258. At the December 2020 IEP meeting, the meeting participants understood that the Student would graduate with a 3rd grade reading level.

259. Caseload Teacher reached out to the Student and his family often to support the Student, including about the Student continuing in the strategic reading course.

260. If students do not have a say in which classes they take, it often negatively affects the students' participation in those classes.

261. The Student needed to take a strategic reading class but was not in a strategic reading class after his 9th grade year.  The Student received reading support services from his caseload teacher and his co-taught classes after the 9th grade.

ISD Director (ISD Director), Program Improvement and Accountability Director for the ISD

262. ISD Director has a bachelor's degree in special education, a master's degree in curriculum and instruction and as a special education supervisor and director.  She is a certified teacher and administrator in Michigan.  She has previously served as a special education teacher and administrator.

263. ISD Director conducts district staff training and state complaint investigations as part of her role for the ISD.

264. ISD Director took part in the state complaint investigation involving the Student (Exhibit R-150).

265. A REED typically includes prior evaluation data.  The September 28, 2020, REED (Exhibit 7) was appropriate.

266. The Student's October 12, 2020, IEP (Exhibit 19) had sufficient data to establish a baseline for the Student.  That IEP had appropriate goals for the Student; they were aligned with state standards.

267. The October 12, 2020, IEP (Exhibit 19) included transition services starting at the end of August 2021 if the Student did not graduate in June 2021.

268. The state complaint team saw evidence that the Student was making progress toward his appropriate IEP goals because the Student was earning credits in his classes.  Graduating with a diploma is evidence that the Student has made satisfactory progress in his academics.

269. The state complaint team determined that the Respondent District provided the Student with FAPE, there was no loss of educational benefit, and, therefore, no compensatory education was warranted.

270. During the state complaint interview with the Student, neither the Student nor the Student's advocate alleged that the Student experienced educational trauma, trauma from the deaths of family members, or that the Student had previously experienced a concussion.

271. ISD Director saw no evidence that the District should have known about the Student's concussion.

272. If the state complaint team interviewers do not ask specific questions about specific issues (i.e., concussions and academic trauma), those issues might not come up in the interviews.

273. To determine whether a student's IEP is meeting the student's needs, it is important to know the nature and extent of that student's disabilities.

274. The data in the Student's Neuropsychological Evaluation (Exhibit 2) is different than the data that the school had available to it (which consisted of information primarily about the Student's progress in classes).

275. The State Complaint looked at the period between January 28, 2020, and January 27, 2021, and alleged that the Student did not have a compensatory education plan, the IEP was not standards based, expectations were inappropriate, tutoring was not utilized, and the Student was denied FAPE.

Director of Special Education (Director) for Respondent

276. Director has bachelor's, master's, educational specialist, and special education director degrees. She is licensed as a social worker and special education administrator. She has been a special education administrator for approximately 20 years and was previously a school social worker and counselor.

277. Director first became familiar with the Student when concerns were expressed about the Student's reading level.

278. Director reviewed the January 23, 2018, REED (Exhibit 6) and found it to be significant and appropriate. The REED contained both past and current data on the Student.

279. A student's eligibility for special education does not drive services; students must receive the services that they need to succeed regardless of their underlying disability.

280. The Student's October 16, 2019, IEP (Exhibit 17) Present Level of Academic Achievement and Functional Performance (PLAF) was appropriate and provided enough data to establish the Student's present levels of functioning. The Student's goals and objectives were appropriate for the Student.

281. The Student's September 28, 2020, REED (Exhibit 7) was appropriate.

282. Students with disabilities were allowed and encouraged to come into school for additional assistance while the Respondent was providing classes remotely.

283. The Student's October 12, 2020, IEP (Exhibit 19) was appropriate.

284. The December 2020 IEP team meeting (Exhibit 100) moved from a goal of the Student completing a construction trades course with extended time, to a goal of the Student completing his credits and graduating on time based on the Student's desires. Both summer school and transition services were offered but the Student declined them because they would not allow the Student to graduate with his peers in June 2021.

285. The Respondent did not want to impose their vision on the Student and prevent him from attempting to graduate if that was his goal, particularly because the Student had obtained credit in some of his prior courses. The Student was motivated and aware of what needed to happen and what he needed to do to graduate.

286. Director was unaware of the Student's full-time employment during the Student's senior year, which negatively impacted the Student's ability to progress.

287. The Student never reported having educational trauma or concussions.

288. The Student graduated with a regular high school diploma.

289. Male students with disabilities are significantly less likely to graduate from high school. Students with disabilities are not simply passed along and allowed to graduate.

290. The Student's freshman year caseload teacher, Caseload Teacher, retired after the Student's first year. The Student's sophomore year caseload teacher left after the Student's sophomore year. Teacher 1 was the Student's caseload teacher for the Student's junior and senior years.

291. The Student's football coach was an effective support for the Student.

292. Students' abilities, potentials, and interests change over time and so the school checks in on students periodically to ensure that the students' goals remain appropriate.

293. When a student isn't making progress in the academic curriculum, all facets of the student's education need to be reviewed and assessed. This may or may not involve amending a student's IEP.

294. Both special education students and identified general education students often have drops in standardized test scores over the summer: the "summer slide."

295. The Student's parent was consulted about the REEDs and did not indicate that additional data was required to determine the Student's educational needs.

21-027515
Page 31

## FINDINGS OF FACT

Based on the entire record in this matter, including the testimony and admitted exhibits, the following findings of fact are established:

1. The Student is a now 20-year-old graduate of the Respondent's High School. (Exhibit R-189).

2. The Student has a specific learning disorder in mathematics and reading; he is ADHD and has PTSD. He has an atypical neurological profile with significant working memory deficits. (Exhibit 2).

3. The Student is capable of reading and performing math at an 8th grade level but his disabilities, and particularly the unevenness of his profile, results in him having difficulties learning. (Transcript (TR), p 45).

4. The Student's reading understanding is at the 50th percentile. The Student's out-loud reading is at the 5th percentile. (TR, p 324).

5. The Student read at a 2nd grade level in 6th grade and at the 3rd grade level in 8th grade. The Student read at the 4th grade level at the start of 9th grade and improved to the 5th or $5.5^{th}$ grade level by the end of his 9th grade year. (Exhibit 6 and TR, p 328).

6. At the December 2020 IEP meeting, Psychologist noted that the Student was reading at a 3rd grade level. (TR, p 594).

7. The Student is able to add, subtract, and do some multiplication (by 1, 2, 5, and 10) but cannot divide; he can do some algebraic functions. (TR, p 268).

8. Despite his serious math deficiencies, the Student passed Algebra I and II (needing to take Algebra IA and IIA twice). The Student passed Algebra II, at least in part, during the Student's junior and senior years while the Student was attending remotely. (Exhibit R-186).

9. The Student is capable of learning. (TR, pp 93 and 333; Exhibit 2).

10. The Student would have benefited from medical treatment of his ADHD (TR, p 95) and from medical treatment of his other various psychiatric issues. (Exhibit 2).

11. The Student was receiving behavioral support from his football coach. Student also received behavioral supports from Teacher 1. (TR, p 342).

12. A functional Behavioral Assessment (FBA) was not performed on the Student. The Student did have a Behavior Intervention Plan (BIP). (TR, p 510).

21-027515
Page 32

13. The Student's 2019 and 2020 IEPs (Exhibits 17, 18, and 19) had nearly identical goals.  (TR, p 372).

14. Teacher 1 made contact with the Student weekly starting in March 2000 when the Respondent went to remote learning; this continued throughout the Student's junior and senior years of high school. (Exhibit R-8, Exhibit R-27, and TR, p 462).

15. Teacher 1 offered multiple interventions to the Student during the Student's senior year, but the Student did not take advantage of many of them. (TR, p 543).

16. The Student's October 2020 IEP (Exhibit 19) offered to continue the Student's education beyond his senior year.

17. At a December 2020 IEP Team Meeting (Exhibit R-100), the Student expressed a desire to graduate and complete his coursework at High School.  Student did not accept Respondent's offer for additional remedial services despite Respondent expressing concern and reservations that the Student needed them and would have difficulty completing the coursework necessary to graduate. (Exhibit R-100).

18. Respondent additionally offered both a summer school program and a remedial reading program, but participation in either program would have delayed the Student's graduation. (TR, p 680).

19. Although the Student acknowledged that the remedial reading class was helping him, he did not want to remain in that class. (TR, p 575).

20. During his senior year, the Student worked full time during the day while attending school online. (TR, pp 263-265).

21. Neither the Student nor the Student's Mother reported specific trauma to Respondent's school personnel other than the death of Student's uncle. (TR, p 628 and Exhibit R-158).

22. The Student's goals were changed at the December 2020 IEP (Exhibit 100) from a construction trades course with remedial help and additional time to an on-time graduation.  That change was made because the Student expressed a desire to graduate on time and attend college to play football. (TR, p 499 and Exhibit 100).

23. Student cheated on his coursework to pass his classes and graduate; he did not do the work himself.  (TR, p 259.)

21-027515
Page 33

## CONCLUSIONS OF LAW

### Events Prior to October 22, 2019

The statute of limitations issue was fully briefed and argued by the parties and decided in the December 20, 2021, Order. Petitioner's request for reconsideration was denied in the January 5, 2022, Order. Although Petitioner again raises these issues in his post-hearing filings, this matter has already been decided and will not be revisited. Petitioner's Complaint does not allege, and Petitioner did not offer evidence at the hearing, that Respondent took affirmative action to preclude the Petitioner from discovering incidents that occurred before October 22, 2019, that could have supported a cause of action. Notwithstanding Petitioner's arguments to the contrary, this case is limited to alleged violations that occurred on or after October 22, 2019.

### Burden of Proof

The principles that govern judicial proceedings also apply to administrative hearings. *Callaghan's Michigan Pleading and Practice* § 60.248, at 230 (2d ed. 1994). In due process administrative hearings, the burden of proof is on the party seeking relief: here the Petitioner Student. *Schaffer v Weast*, 546 US 49 (2005). The burden of proof is upon Petitioner to prove by a preponderance of evidence that he did not receive FAPE from the Respondent and that any compensatory education is necessary and appropriate.

Proof by a preponderance of the evidence requires the trier of fact to determine that the evidence supporting the existence of a contested fact outweighs the evidence supporting its nonexistence. *Martucci v Detroit Police Commissioners*, 322 Mich 270 (1948). The standard of proof is a "preponderance of evidence," most frequently described as "that evidence which carries the greatest weight." A "preponderance of evidence" has been defined by the Michigan courts as: "proof by a preponderance of the evidence requires that the fact finder believe that the evidence supporting the existence of the contested fact outweighs the evidence supporting its nonexistence." *Blue Cross and Blue Shield of Michigan v Milliken*, 422 Mich 1 (1985).

### Respondent was not required to conduct additional comprehensive educational evaluations including cognitive functioning, behavioral, or transition assessments.

Petitioner argues that the Respondent failed to appropriately reevaluate the Student for his junior and senior years (and earlier, but those claims were dismissed as outside the statute of limitations). Petitioner's rationale for why additional evaluations were necessary is that the Student was not making progress as evidenced by his IEP goals remaining the same year after year, thereby indicating a lack of progress.

**21-027515**
**Page 34**

To be certain, it is concerning when IEP goals are not updated throughout a student's educational career. This fact alone, however, does not establish that a FAPE was not provided. If a student has not achieved a goal but that goal remains achievable and reasonable, one would expect that the student continues to work toward achieving that goal. One would also expect a discussion about how the goal is to be achieved going forward, since it was not achieved initially.

The only evidence Petitioner presented that Respondent needed to perform additional evaluation(s) of the Student came from Petitioner's special education expert witness. Expert reviewed all of the Student's relevant educational records but did not interview the Student or his mother. Expert was critical that the Respondent did not encompass a "full battery of assessments … from all the teachers and all the service providers who interact with him …." (TR, p 130).

Expert argues, without explanation, that "state and district assessments should not be used to help make a determination about a child's individual educational programming" because they are not individualized to the Student. (TR, pp 135-136). He then notes that these general assessments are appropriate to include but cannot be relied upon to determine the Student's progress. How the Student is progressing compared to his same-grade peers is an appropriate measure of the Student's progress, and the Respondent appropriately incorporated these assessments into its evaluations of data for the Student. Merely because a test was also given to other students does not make it any less valid for the Student here.

In contrast, Respondent's witnesses testified that there was sufficient testing and evaluation of the Student performed to evaluate his abilities and prepare an individualized course of education for the Student. The testing showed the following:

Current Evaluations

Scholastic Reading Inventory (Strategic Reading): 9/14/17 lexile score - 589 (proficient for 3rd grade level); 11/16/17 lexile score - 596 (an increase of 7 points-proficient for 3rd grade level)

NWEA-Map Benchmark Assessments:

Reading (fall 2017) - 191(drop of 18 points from the spring 2017), 3rd percentile, 3.0 gle; Areas Assessed- Literary Text: Language Craft, Structure-179 (*Suggested Area of Focus), Informational Text- Language, Craft, Structure-193, Literary Text-Key Ideas and Details-194, Informational Text-Key Ideas and Details-195, Vocabulary-Acquisition and Use-198

Math (fall 2017)- 200 (12 point drop from spring 2017), 5th percentile, 3.5 gle; (winter 2018) - 204 (4 point increase from fall 2017), 7th percentile, 4.0gle; Areas Assessed: The Real and Complex Number Systems-195 (*Suggested Area of Focus), Geometry-206, Operations and Algebraic Thinking-208, Statistics and Probability-209

[Student] is in the 11th grade here at KC. He has earned 12.5 credits towards graduation with a cumulative GPA of 1.49.

[Student] 's current grades are as follows:
Algebra 2A Pt 1: 48%
Recreational Sports: 59%
Earth Science A: 35%

Based on 1) [Student] 's current functioning, 2) the most recent evaluation findings and 3) any additional assessment information, does the IEP Team determine that this student has a disability that requires special education programs/services?

(Exhibit 18, p 1 – Fall 2020 IEP).

Expert also noted that he would have liked to have seen behavior rating scales to determine the social and emotional needs of the Student and see if additional supports or programming were needed. (TR, pp 137-138). This is addressed below in the behavior issue discussion.

Petitioner argues that had an additional, more comprehensive, evaluation been performed, such as the evaluation performed by PN, it would have shown additional areas of strengths and weaknesses for the Student that could have been used by the Respondent to craft a more tailored IEP for the Student. However, the mere fact that further evaluation would have provided additional information does not necessarily indicate that the Respondent had reason to suspect that additional evaluation was needed, or that this additional evaluation was required, necessary, or would have led to a better outcome for the Student.

Petitioner has not established by a preponderance of the evidence that the Respondent should have known that additional evaluations of the Student were necessary or required. As attested by the Respondent's credible witnesses' testimony, Respondent's evaluations of the Student were sufficient.

Respondent did not fail to create appropriate postsecondary goals.

School districts are required to develop IEP goals that are reasonably calculated to enable a child to make appropriate progress considering the child's circumstances. *Endrew F. v Douglas County Sch Dist*, 137 S Ct 988 (2017). IEPs should have measurable goals that include the child's progress toward the annual goals with periodic reporting on those goals.
34 CFR 300.320(a)(3).

Here, the Student's post-secondary goals at the 2019 and October 2020 IEP were appropriate: learning the basic reading and math skills to allow him to work in construction trades. The post-secondary goals set at the December 2020 IEP, as it turns out, were not appropriate for the Student. While this was suspected by the Respondent, the Student and his family and support network strongly advocated for allowing the Student to try to graduate with a diploma rather than attend remedial courses, summer school, and additional programming beyond his senior year of high school.

Petitioner essentially argues that the Respondent should have overruled the Student's desires and placed him in a more restrictive environment rather than allowing him to try to do the work and graduate from high school. Petitioner argues that the Respondent should have not just suspected that the Student's goal of graduating with his peers on time was inappropriate, as they did, but should have known and insisted that the coursework assigned to the Student was too rigorous to complete. Petitioner points to the fact that the Student could not complete his coursework without cheating as evidence that the coursework was too rigorous for the Student. However, because the Student

cheated on the material and did not give his full and complete effort, it is unknown whether that coursework really was too rigorous for the Student to have passed on his own.

Respondent had every right to expect that the Student would attempt to do his course work on his own without cheating. Respondent and its teachers are not responsible for policing the Student's work to confirm that he does not cheat. If the Student had not cheated and had attempted to complete the material on his own, he would have either 1) completed the material or 2) failed the material and remained enrolled in the Respondent district where Respondent could and would have provided additional services to the Student in the form of summer school and/or a fifth year of high school, either on or off site.

Respondent's decision to allow the Student to try and complete the work and graduate with his peers was entirely reasonable. Respondent was not required to overrule the Student's and his family's request to attempt to complete the assigned coursework and graduate. Continuing beyond the Student's senior year was seen as a backup plan if the Student was not able to complete the assigned work and graduate.

If the Student had tried to complete his course work, failed, and then the Respondent did not offer additional services (saying in effect, "we told you so, that it was too difficult"), the Respondent would have been in violation of IDEA. But that is not what happened here. Respondent was ready to continue the Student's education if he could not complete the required work. However, the Student successfully deceived the Respondent by turning in others' work as his own and, in so doing, qualified for a high school diploma. When the Student turned in the assigned work, the Respondent was entitled to accept it as the Student's work at face value as it did so here.

The Student falsely represented that he had done the work assigned to him and learned the material, thereby completing the goals assigned to him. Respondent, therefore, had no obligation to modify the goals further, believing that the Student had accomplished them by graduating.

<u>Respondent did not fail to provide appropriate accommodations or related services to the Student</u>.

Respondent provided many accommodations to the Student. Petitioner and his experts agree that the accommodations that the Respondent provided were appropriate (Exhibit 2, TR, pp 57 and 158) but believe that these accommodations were insufficient. The accommodations Respondent provided to the Student included extended time and the use of a computer or tablet, access to small group sessions, modified assignments, some materials read to him. Student was also offered, but did not avail himself of, text-to speech. (Exhibits 17, 18, 19, and R-189).

There is no evidence that the Respondent knew that the Petitioner required trauma-based services beyond what the Respondent offered to all special education students in the

form of direct instruction on social emotional learning. (TR, p 464). Petitioner did not avail himself of the services that were offered, and therefore likely did not need additional services. Further, the Student had "safe people" that he could go to with issues, including primarily, but not exclusively, his football coaches. The Student sought out Teacher 2 for assistance even after he was finished taking her course.

The list of recommendations in the neuropsychological report (Exhibit 2) are considerable. It is difficult to imagine a school implementing all of those accommodations without providing the Student a one-on-one aide – they could not be fully implemented even in a co-taught or resource room class. The special education teacher would need to spend the vast majority of his or her time implementing the Petitioner's proposed accommodations for the Student, leaving little time to spend with other special education students.

Given that the Student did not want to remain in Teacher 2's reading intervention course, it is unlikely that the Student would have accepted or thrived in such a controlled environment as the Petitioner proposes. Similarly, the Student likely would not have desired or accepted specialized remedial instruction on life skills for the same reasons that he did not desire to remain in his remedial reading course.

The Student did not accept many of the accommodations, supports, and services that the Respondent offered. For example, the Student attended only one in-person tutoring session. It is difficult to believe that if the Respondent had simply offered more accommodations or services to the Student that the Student would have accepted them. It is also unknown just when the Student would have had time to utilize additional accommodations since he was working a full-time job and apparently did not have the time to do his regularly assigned course work and had other classmates do it for him.

Similarly, the Student's alleged lack of understanding about the accommodations offered does not seem to have been the primary problem. Rather, the evidence shows that the Student was simply not interested in earnestly attempting to do the assigned work. The Student understood that he was given extra time to complete his assignments but often used that time to goof off in class, which teachers made very clear was unacceptable behavior. Further, the Student didn't spend his class time talking with his friends because he didn't know better, he did that because he wanted to be social rather than attempt the assigned work. Perhaps much of the work was too difficult for him, but rather than attempt to complete it and seek out assistance, the Student opted simply not to do many of his assignments.

The Student often did not respond to Teacher 1's emails and offers of assistance – this wasn't because the Student didn't understand what was being offered, but because he wasn't interested in doing the work. Rather than seeking assistance with the coursework that was too difficult for him, the Student opted to have others do the work for him.

Respondent offered appropriate accommodations to the Student. The Student simply chose not to utilize many of them. Petitioner argues that this shows that the accommodations were inappropriate, but this does not follow here. Sometimes students, especially those with disabilities, are simply not interested in doing their schoolwork. There is only so much that a school can do to encourage their students to do their work. When a student fails to learn, it does not necessarily mean that the school has failed to teach. That is the case here.

Respondent did not fail to appropriately address the Student's behaviors that were impeding the Student's learning.

Behavior was only an issue for approximately four months (from mid-October 2019, two years before Petitioner's Complaint was filed, to mid-February 2020, when the last behavioral incident was recorded). There were, not surprisingly, no behavioral issues after the Respondent went to remote learning in March 2020 through the Student's graduation.

Expert noted that he would have liked to have seen behavior rating scales to determine the social and emotional needs of the Student and see if additional supports or programming was needed. (TR, pp 137-138). However, Expert did not indicate why these were necessary given the Student's disciplinary actions. Expert also did not indicate why the Respondent's behavioral interventions (primarily having Student see his coach) were insufficient. Finally, Expert offered no explanation about why additional supports would have been utilized when those that were offered were often not used.

Petitioner points to certain incidents of behavioral outbursts by the Student caused by the Student's embarrassment at having to read out loud in class or anxiety about school coursework. These behavioral outbursts and resulting discipline, however, are relatively rare. Considering the Student's overall behavior, his academic struggles do not appear to be the primarily cause of his behavioral issues. Instead, the primary issue with the Student's behavior and resulting discipline appears to be his desire to socialize with his friends. The Student's socialization with his friends is unrelated to his academic disabilities.

The Respondent appropriately found a motivating factor for the Student – his desire to play football – and used that motivation to keep the Student on track with his academics. This worked well during football season but was less effective after the football season ended. The Respondent continued to allow the Student to meet with his football coaches when he was having difficulty in his classes. This was an effective intervention, even outside of football season.

The Respondent created a BIP for the Student (Exhibits 23 and 28). Teacher 1 checked in on the Student weekly and usually received no response from the Student. Additional evaluation, assessment, and intervention was not required. Petitioner has not established

21-027515
Page 39

that the behavioral supports that the Respondent put in place were ineffective or inadequate.

<u>Respondent did not fail to provide the Student with assistive technology devices or services</u>.

Petitioner presented evidence of the Student needing only text-to-speech and the use of a computer or tablet as necessary for the Student to be successful (Exhibit 2). Respondent provided those services to the Student although the Student did not always utilize them, particularly the text-to-speech service on his computer. The fact that these technology devices are not listed in the Student's IEP is inconsequential – the Respondent provided these services to the Student.

Petitioner argues that those services available to all students are irrelevant because they were not tailored to the Student's individual needs; this is untrue. If the Student needed text-to-speech and the Respondent offered it to him, it does not matter whether the Respondent offered that service to other, non-disabled students. Respondent offered to show the Student how to have his computer read his assignments to him. The Student was not interested in this, likely because he was no longer doing most of the work that was assigned to him.

Respondent offered the appropriate assistive technology devices and services to the Student.

## **CONCLUSION**

This is a very sad case. The Student currently reads at somewhere between a 3rd and 5th grade level. He cannot do much math beyond basic addition and subtraction. Despite this, he graduated from the Respondent's High School with a diploma. Student admits that he had others do much of the required work for him.

Although Respondent may not have fully understood the specifics of the Student's deficits, Respondent knew that Student had significant math and reading disabilities. Respondent offered multiple accommodations, supports, and services. Unfortunately, in December 2020 the Student made the decision to reject many of these services (remedial reading, summer school, and at least one additional year of school) to attempt to graduate with his classmates and attend community college to play football.

Either because the assigned work was too difficult, there was a lack of motivation, or the Student had a lack of time while working full time during school hours, the Student made another series of poor decisions to cheat by getting others to do his assigned schoolwork. As a result, the Student did not make actual progress toward his goals of improving his math and reading skills to his full potential of an 8th grade equivalency.

**21-027515**
**Page 40**

Petitioner alleges that the Respondent school district needed to do more: do more testing, provide more accommodations, and offer more services.  Petitioner further alleges that the Respondent had an obligation to provide those services even though the Student and his family expressly stated that they did not want those services and instead wanted the Student to graduate on time with his peers.

It is difficult to imagine that the Student, who cheated on the work that he asked to do, would have put in full and complete effort into remedial work that was forced on him against his stated desire.  No amount of support and social work service can force a student to do work that the student simply does not want to do and feels that he does not need to do.  Dismissing the Student's goal of graduating and playing college football would have further discouraged and disheartened this Student.  Respondent was correct to allow the Student to try to achieve his desired goals and school staff appropriately expressed their concerns at that December 2020 IEP meeting that Student did not have the skills and abilities and would fall short.

Petitioner, having rejected much of the remedial services offered in December 2020 in favor of cheating to graduate on time, now seeks to have the Respondent provide those services in the form of compensatory education.  However, the Petitioner has not established that the Respondent failed to provide the Student with a FAPE.  If the Student had not cheated, he would have either succeeded (unlikely) or failed, thereby allowing the Respondent the opportunity to implement their proposed remedial education over the summer and in additional years of schooling.

Respondent offered sufficient services reasonably calculated to enable the Student to make progress appropriate in light of the Student's circumstances.  Although the Respondent perhaps could have done more, they were not required to do so to comply with IDEA and to provide FAPE.

Neither party has advocated for revocation of the Student's diploma and re-enrollment in the district, and so that remedy will not be ordered.

The Student, his family, and his support network will no doubt be disappointed in this result, but the Student should not be disappointed in himself or doubt his abilities.  The Student has the capacity to learn and should be able to read and perform math calculations at a level necessary to reach his career goals.   The undersigned Administrative Law Judge wishes the Student well in his future endeavors and hopes that he is able to continue to work toward and achieve his goal of serving as a skilled tradesperson in the construction industry.

21-027515
Page 41

## ORDER

**NOW, THEREFORE, IT IS ORDERED** Petitioner's complaint is denied.

**IT IS FURTHER ORDERED** that any claims or defenses not specifically addressed herein are dismissed with prejudice.

A party aggrieved by this decision may seek judicial review by filing an action in a court of competent jurisdiction within 90 days of the date of this order.

**Michael J. St. John**
**Administrative Law Judge**

**21-027515**
**Page 42**

## KEY OF INDIVIDUALS, LOCATIONS, AND SERVICES

| | |
|---|---|
| Caseload Teacher | Mr. Caldwell |
| Director of Special Education (Director) | Reuquiyah Saunders |
| ISD Director | Victoria Wentela |
| High School | Kalamazoo Central High School |
| ISD | KRESA |
| Pediatric Neuropsychologist (PN) | Chiarina Owens, Ph.D. |
| Principal | Valerie Boggan |
| School Psychologist (Psychologist) | Lori Morcum (previously Spreitzer) |
| Special Education Expert (Expert) | David Bateman, Ph.D. |
| Special Education Teacher 1 (Teacher 1) | George Sachse |
| Student | D.L. |
| Student's Mother (Mom) | B.L. |
| Transition Coordinator (TC) | Kevin Downing |
| Teacher 2 | Jill Rogowski |

**21-027515**
**Page 43**

## PROOF OF SERVICE

I certify that I served a copy of the foregoing document upon all parties and/or attorneys, to their last-known addresses in the manner specified below, this 13th day of October 2022.

*Verna Curtis*

**Verna Curtis**
**Michigan Office of Administrative**
**Hearings and Rules**

**Via Electronic Mail**

Elizabeth Abdnour
Elizabeth Abdnour Law
1100 W. Saginaw Street, Suite 4A-2
Lansing, MI 48915
**elizabeth@abdnour.com**

Erin Diaz
Michigan Protection & Advocacy Service, Inc.
4095 Legacy Parkway, Ste. 500
Lansing, MI 48911
**ediaz@mpas.org**

Mitchell Sickon
Michigan Protection & Advocacy Service, Inc.
4095 Legacy Parkway, Suite 500
Lansing, MI 48911-4264
**msickon@mpas.org**

Jacquelyn Babinski
MI AECRES
P.O. Box 705
Ludington, MI 49431
**jbabinski@miaecres.org**

Kalamazoo Public Schools
c/o Dr. Rita Raichoudhuri, Superintendent
1220 Howard Street
Kalamazoo, MI 49008
**raichoudhurira@kalamazoopublicschools.net**

Jordan M. Bullinger
Clark Hill PLC
200 Ottawa Avenue NW, Suite 500
Grand Rapids, MI 49503
**jbullinger@clarkhill.com**

Katie Ilijic
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
**kilijic@clarkhill.com**

Bethanie Eggleston
Michigan Department of Education
P.O. Box 30008
Lansing, MI 48933
**EgglestonB1@michigan.gov**

Precious Boone
Michigan Department of Education
P.O. Box 30008
Lansing, MI 48933
**MDE-Adminlaw@michigan.gov**